I'm David Altman, and the case deals with the jojoba bean development with the Calneva Limited Partnership. And I just have a short introduction here that I would like to read before we get into the case. And I entitled it, Why Is This Case Different? It turns out that in the jojoba limited partnership, I invested in the Calneva Partnership in 1982. And subsequently, there were many other partnerships dealing with the same incentive, same program,  and there turned out, according to the record, over 20 limited partnerships subsequent to that. And mine was the first one, and it was not the one that was the model. The model for the all subsequent partnerships was based on Utah Jojoba Partnership, which was shortly after the Calneva, roughly the same time period. Now, the situation here was that the respondent lawyer, in order to save time and money, suggested to the general partner of Calneva that the Calneva should accept the court's judgment and opinion on the case with the belief that Utah Jojoba was very similar or virtually identical, were the words, with Calneva. Now, as I showed in my opening brief, as the facts were developed, they were indeed not that similar, quite a bit different. And the difference accounted for a good deal of the difficulty that I ran into. Having had a very The only issue here is the negligence penalty, right? The only issue here is the negligence penalty, and therefore, the question is, really, back at the beginning, were you negligent? I'm sorry. Could you speak more slowly? The question is, back at the beginning, back when you made this investment, were you negligent with regard to investigating? And when you took the tax deduction, were you negligent with regard to investigating the investment and the tax consequences of it? So I think, in other words, the problem is that I don't know that you're in a position now to reopen up the question of whether or not this was, in fact, an illegitimate tax deduction. The question is, were you negligent with regard to that issue? Yes, exactly. The point here was not an argument on the underpayment of taxes. It was an argument on whether I was negligent in reviewing the information on making the original investment. I understand that, and I want that to be clear. As I understand it in the record, Mr. Altman, there are a number of steps that you actually took to investigate. Yes. Tell us about those. OK, this was a R&D investment, and I had a great deal of experience with that. My original experience on R&D actually went back some 75 years. When I was in high school, I did the first bit of research that was considered significant enough to be publicized, and I was asked to present it at the American Museum of Natural History in Manhattan. But with respect to this particular matter, the government is going to get up and tell us here that you should have known that the tax consequences with respect to this investment were too good to be true, and therefore, you were negligent in pursuing it. So address your thoughts to that. OK. First of all, it was not too good to be true. There's always an exaggeration, which I understood when you're trying to sell a program. I had a good deal of experience with that in my work at the division of the United Technologies Corporation where I was the vice president for 22 years. But how did you consider the warnings in the private placement memorandum that were so draconian? How did you consider those warnings before you invested in CalNeva? How did those warnings strike you? And what, if anything, did you do? Because they were very positive that this was not a very good investment. How did you consider those warnings? Yes. In looking at the investment, I knew about jojoba oil and that it was a substitute for sperm whale oil that had quite a number of applications. I had previously worked with the sperm whale oil, so I knew about the various applications in the field. Medicinally, it was a great detergent. And as a matter of fact, I had received a contract from the Navy during World War II to investigate the use of various detergents, including sperm whale oil, which had an impact on the conduct of the war in the Normandy invasion that the US had indulged in. What I understood you to be saying before is that when you spoke to the people who were pushing this investment, you didn't necessarily believe their whole story to the degree of what their projections were. And you worked out your own projections. Is that what happened? No, I did some private investigating on my own. I think that's what you want to know, what I did personally. Right. Right. I found out there was information in the private placement memorandum that showed what the typical yield per acre is of jojoba beans. And that was an important element. I found out that the research was done at the University of California at Riverside, the University of Arizona. And also, there was some information that came from Israel on jojoba development. Because the climate of Southern California and Northern Mexico was ideal for the growth of jojoba. And looking at the yields, I independently read about it. And that was the source of a good deal of the information in the memorandum. And I found out, I don't have it with me here, but I had penciled notes that I picked up in the library, which showed what the yields were. And I arrived at the fact that the yields were of the order of 91% less than what was claimed in the private placement memorandum. But you still felt that was a good investment, nevertheless? That was considered within the noise level of what I considered valid. Because when I proceeded with the analysis, I discounted the yields and the profit by first 30%, then 50%, and eventually 70%. And it turned out that there was still some small profit at that point. The big risk was whether, from my own experience, the big risk was, what is the competence of the research group? And I concluded, after several years when it appeared as if the results were not favorable of forthcoming, that that was really due to the incompetence of the investigator. Did you consult any other professionals about this, in addition to whatever research you did yourself? No, I didn't. I didn't feel I would learn much from that. I thought that I had the various facts in hand. I knew about Section 174 that deals with requirements for reimbursement on research and development. And I not only satisfied those, but in my own experience at the company in doing independent research and development, if you're acquainted with that requirement, it's similar to the reimbursement here, where the company is allowed a deduction or to include the expense of R&D against his overhead. Since you're an experienced investor, how did your determination to invest in CalVac differ from other investing you have done in other ventures? Mm-hmm. Well, this was the first investment that was involved with R&D. All my previous experience was with a company or a part of my employment. I had invested in quite a number of limited partnerships. And it was very popular at the time in the 60s and 70s for executives to do that because we were busy and they wanted some opportunity of getting into an investment field. And I experimented with a number of those. And it's a matter of record to show that I had invested in many of them. They appear in my tax returns. One last question. The other major problem is whether you consulted or whether you were negligent with respect to the tax consequences. Now, there is some record evidence that you did deal with your CPA about this to some degree. Can you tell us what the record shows about that? I'm sorry. I missed that. What? Did you consult with your CPA, with your accountant, about specifically about the tax consequences? Yes, I did. I went to my accountant at the time, who was Mr. Earl Moller. He was president of the firm Moller, Nixon, and Williams. And I had dealt with him for many years, some 15 years or so. He used to be an accountant at Price Waterhouse and eventually opened his own firm. And so we discussed the matter at the time. And I did have a sheet of paper which just had the elements of the investment, because CalNEVA, in contrast, as far as I could tell from the other partnerships, and in contrast with Utah, Pahoa, they had received an opinion regarding the tax consequences and the legality of the investment. Mr. Ullman, did you show your accountant the private placement memorandum for this investment? No, I didn't have it in hand with me at the time, but I had the various details. And I did discuss those. You had your notes. I had my notes, and I had one sheet of paper which was the summary of the opinion  group that the group that the group that the group that the group that the group that the group that the I just reviewed.   Do you think you explained to him why you thought that there was a prospect for profitability? And you explained to him why you thought it was profitable. So you had you had a substantive discussion with him of some kind. Sorry? Did you have you said and as I recall, in the hearing, that you had asked your accountant, that your accountant asked you about whether there was a prospect for profitability and you explained to him why you thought there was. So there was some substantive discussion with your accountant. Is that right? Yeah. Now my accountant had the whatever facts he had came from me in the sheet of paper I had, which was a summary. And I, excuse me a moment. I did talk to the accountant that's still alive. I did talk to him a couple of years ago regarding if he remembered anything. But he was president of the firm at the time. And we're talking about a period in 82, at the end of 82, or early 83, which is what, over 25 years ago. So obviously he knew me and we talked about each other, but he couldn't remember any of the details. That's why he didn't appear in court. All right. One more question, Mr. Altman. Is the story that you've just told us about your meetings with the accountant part of the record in this case? Were you able to tell the tax court about that? Yes, I did. Yes, you did. Very well. Mr. Altman, your time has expired. In fact, we gave you four minutes more than you were allowed. But we're happy to do that. Well, if at some point you have another few minutes, I do have some comments to make regarding the consequence of an overview of this whole affair, because I've had time to give it a lot of thought. I think it might be significant for you to know that. But I would only do it if you could allow me a few minutes. Well, I don't think it would be appropriate in this proceeding today. Perhaps some follow-up filing might be a more appropriate time. Thank you, Mr. Altman. Your time has expired. We will now hear from the Commissioner. Good morning. May it please the Court. Steven Uegio from the Department of Justice, appearing on behalf of the Apt. Lee, the Commissioner of Internal Revenue. The tax court correctly found that taxpayer was negligent under Section 6653 for the tax year 1982. Under Section 6653, negligence is a lack of due care or the failure to do what a reasonable or prudent person would do under similar circumstances. Determining negligence depends both upon the legitimacy of the underlying investment and the due care with respect to claiming a deduction. Well, how could he be negligent when he made an independent investigation and it may have not been – it may not have panned out? But you're dealing with an intelligent man who looked into the facts, has some knowledge from many, many years of experience, and determined that the prospectus was heavily understated insofar as its possibilities of profitable profit realization. And he made that determination in good faith. He didn't make it to swing any tax dodge or anything. He made it and it turned out to be incorrect. So how could that be negligent? We're all investors, myself, too, and I hate to tell you how many times I guess wrong. Understood, Your Honor. What I think is important here, Your Honor, is to separate the research that taxpayer did with respect to jojoba as a plant or its potential to be cultivated in a more efficient manner or researching how tall it could grow or what it looks like with the tax consequences in this case. But he did talk to an accountant and he did apparently have a dialogue with the accountant and apparently the accountant did question the profitability and he explained to the accountant why he thought that – so they were linked together because he then in the dialogue with his accountant apparently explained to the accountant why he had come to the conclusion that it would be profitable. And so what more was he supposed to do over a $5,000 investment? He investigated himself. He spoke to his accountant. He – what else? Well, Your Honor, here the private place memorandum was explicit. It explicitly referred to Calneva as a tax shelter. It stated that it warned potential investors that by investing in Calneva, they were subjecting themselves to material tax risks. Is the government's position that any time a disclosure memorandum mentions the word tax shelter, that it is automatically subject – that the investor is automatically subject to a negligence penalty? No, Your Honor. Well, what does the government expect under these circumstances? He talked to his accountant.  What more does he have to do? Well, by the terms of the private placement memorandum itself, Calneva stated that potential investors should consult with their own advisors. Taxpayer did not do that here. Wait a minute. Do you disagree with what Mr. Altman said in open court today? No, Your Honor. It is in the record that taxpayer spoke with his accountant regarding the investment. Well, what's wrong with that? Isn't that enough? Well, in terms of the actual – the actual business of Calneva, it's instructed potential investors to consult with outside advisors. Not here. Taxpayer just spoke with the general partner. As to the part of the consultation that would involve the investment itself, you have an unusual person here. I mean, is your position that because he didn't need to consult with someone else, because he had expertise of his own, therefore he's negligent? He has to consult with somebody else even if he has his own expertise? No, Your Honor. Obviously, the facts and circumstances will depend on each case. And here we recognize that Mr. Altman had a lot of experience in science and technology and prior research and development. So what was he supposed – so consulting with an accountant isn't good enough? With respect to the tax issue, Your Honor, there is no indication that Moller had any experience with Section 174 or that he offered any opinion as to whether or not these expenses would be deductible under one section – under Section 174 to taxpayer. Taxpayer may have said, yes, you know, I think this partnership will be profitable at some point in the future, you know, against what the partnership itself is saying, but that has no bearing on whether or not those expenses are deductible under Section 174. So the record says, okay, you reviewed the summary of the tax opinion. Is that correct, Dr. Altman? I used that, and of course I verified that later with my CPA, Mr. Moller. So he says he did go over it with Mr. Moller. And in addition, in the private placement memorandum itself, it stated you need to obtain a copy of the full opinion letter, which was not provided to the taxpayer when he received the private placement memorandum. He did not do so, nor did he provide this to Moller. What opinion letter are you talking about? The opinion letter which taxpayer mentioned, which CalNEVA was relying on to say, you know, there is – there's little published authority dealing with whether or not these expenditures which we will be making can be deducted under Section 174. We're not going to ask for a ruling from the IRS, but what we're going to do instead is we're going to rely on this opinion letter. You should go out, get the – read the opinion letter in its entirety on your own before you make this investment. So I read your brief. The point that you make, I think, and which you rely upon mostly, is before the tax court, where they're making a fact-finding, that he offered no – he offered no accountant or anyone that – to verify that he had spoken to them and that they had given him an affirmative opinion that – or a neutral opinion, any opinion. He received no – so that before the tax court, the only thing was he didn't offer any – any verification that his investment was a bona fide, legitimate investment for income purposes. Now, my question to you is, should it make any difference that he didn't offer anyone before the tax court who was making this fact-finding when he himself appeared before the tax court and said that he spoke to these people and he certainly didn't say anyone there talked him out of investing in this thing? Well, Your Honor, I think what's important here is that Taxpayer did not receive any independent advice in terms of evaluating whether or not these expenses would be deductible under Section 174. I don't understand that. He says that he talked to what documents – did you review the tax ramifications, Mr. Mohler? Yes, I did. What tax documents do you show Mr. Mohler? I had read documents. I had some notes and a summary. After your meeting with Mr. Mohler, what was your understanding of being able to take the tax deduction? Well, he questioned the business of the profit motive, and I mentioned I'd done an analysis with it – of it, and it would be a profit either under conservative set of circumstances, and he thought that was important. Then there was an objection by the government lawyer, and there's a whole dialogue about whether this representation of what Mr. Mohler said could come in, and eventually the – I believe the Court said it could come in. Right. So what's the problem? What I think what's important here, Your Honor, is there's no indication whatsoever that Mohler affirmatively discussed whether or not these expenses would be deductible under Section 174. As the tax court found, there's no – Well, now, is the government's position that the investor must submit proof that the investor actually talked to a tax professional and specifically said, are these deductible or not? Is that – is that essentially the government's position? Well, as – as this Court has held, there's two kind of requirements in terms of analyzing whether due care has been exercised. That is, the underlying investment itself, and whether or not the taxpayer exercised due care in claiming the deduction. So in terms of that second problem, I think is where your question is, Judge O'Scanlan. It's not – It's not a fair implication that he talked to his CPA, he explained to the CPA, the CPA said, yes, that's important, he discussed the tax ramifications, and then he put it on his tax return. I don't know whether the CPA signed it, but I assume he did. There's a factual finding by the tax court, however, Your Honor, which said, you know, there's no indication here that Moeller did anything that simply transfer a number from CalNEVA's partnership return, K-1, to the taxpayer's return. But that's wrong, because we just read the fact that he had a whole consultation with Moeller of some kind about this. Not with respect to whether or not those expenses would be specifically deductible under Section 174, Your Honor. Did you review the tax ramifications? Yes, I did. So he had to say, that's not good enough, and he had to have said, I reviewed the particular fact that this would be deductible when I was planning to deduct it? I think it would be informative, Your Honor. It could have – he could have just said, you know, can I claim a deduction? Sure. He could have said it, but it's a pretty fair implication that since the tax ramification here was deducting it, and it was, in fact, deducted, that that's what he discussed. That's possible, Your Honor, but it's taxpayers' burden to show that he exercised due care. Here, he could have simply asked the follow-up question, did you discuss Section 174, and what did he tell you with respect to whether or not that deduction would be made? He didn't do that, Your Honor. Is this purely a factual question, or is this a – is there a legal issue here? No, it's just a factual question, Your Honor, whether or not taxpayer acted negligently. Well, I suppose another – a jury – now, in this particular case, it was the tax court judge sitting as the fact finder, but a jury could look at the same showing and come out the other way and say, oh, yes, he – he was – he did have due care. May I answer your question, Your Honor? I see my time is up. Of course. Of course. That is completely possible, Your Honor, but again, this is a factual finding by the tax court. Well, it's not possible. He could have paid the tax and then asked for a jury trial before the district court. That as well, Your Honor. So what we're getting here is strictly a question of fact, a finding of fact, and our – the standard review is whether or not that's clear error. Is that correct? That's correct, Your Honor. Why can't we determine, based on an intelligent man, well-advised, an investor, just that this is clear error, he just – he invested in something and just didn't – that's the way the cookie crumbled in this case? Well, Your Honor, again, I would just refer to the private placement memorandum and the explicit and numerous references to the tax considerations raised by this investment. But aren't you saying the following, that any time a – something comes on the market, which is not Fortune 500, which has got all sorts of verification, that you invested that and it goes sour, you're stuck? No, Your Honor. No, Your Honor. That's not what I'm saying. Again, if taxpayer – this could have been a different case if taxpayer had gone to someone outside of CalNEVA, other than Benham and Pace, perhaps to evaluate, you know, okay, I understand what the papers are saying, I've done my own analysis, what is your take? Or – again, I'm not saying that's a requirement. Does that go to the investment or does that go to the – I thought you had walked away from any claim that he needed to do more with regard to the viability of the investment, and you were just talking about the tax consequences. That was just in response to Judge Collins' question, Your Honor. Well, who's going to go make a $5,000 investment and then go and speak to your – my client, and then go and make $150,000, $200,000 an hour for me to speak to him? And for a $500 investment, I've got to do that in order to make sure in the event it goes sour that I can't deduct it? If it's warning you that this is a tax shelter and it could subject you to serious penalties, I would think that you might want to do that, Your Honor. And then I've got to bring him into the tax court to testify before a tax judge? It would depend on the facts and circumstances, Your Honor. Counsel, your time has expired. Thank you, Your Honor. The case just argued will be submitted for decision.
judges: O'scannlain, Cowen, Berzon